IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| TRACY W., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) 1:24CV993 |
| | ) |
| FRANK BISIGNANO,[1] | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

MEMORANDUM OPINION AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE

Plaintiff Tracy W. ("Plaintiff") brought this action pursuant to Sections 205(g) and 1631(c)(3) of the Social Security Act (the "Act"), as amended (42 U.S.C. §§ 405(g) and 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security denying her claims for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under, respectively, Titles II and XVI of the Act. The parties have filed cross-motions for judgment, and the administrative record has been certified to the Court for review.

I. PROCEDURAL HISTORY

Plaintiff protectively filed applications for DIB and SSI on November 22, 2020, alleging a disability onset date of September 12, 2018 in both applications. (Tr. at 158, 427-34.)[2] Her

---

[1] The United States Senate confirmed Frank Bisignano as the Commissioner of Social Security on May 6, 2025, and he took the oath of office on May 7, 2025. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Frank Bisignano should be substituted as the Defendant in this suit. Neither the Court nor the parties need take any further action to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

[2] Transcript citations refer to the Sealed Administrative Record [Doc. #5].

applications were denied initially (Tr. at 89-136, 183-87) and upon reconsideration (Tr. at 137-54, 195-202). Thereafter, Plaintiff requested an administrative hearing de novo before an Administrative Law Judge ("ALJ"). (Tr. at. 203-17.) On March 9, 2023, Plaintiff, along with her attorney, attended the subsequent video hearing, at which both Plaintiff and an impartial vocational expert testified. (Tr. at 158, 50-77.) Following this hearing, the ALJ concluded that Plaintiff was not disabled within the meaning of the Act. (Tr. at 169.) However, in an Order dated September 20, 2023, the Appeals Council identified errors in the ALJ's decision remanded Plaintiff's case for further proceedings. (Tr. at 178-80.)

On April 25, 2024, Plaintiff, represented by counsel, appeared before the same ALJ for a brief telephone hearing, at which Plaintiff and a vocational expert again testified (Tr. at 10, 40-49), and, in a decision dated May 22, 2024, the ALJ again concluded that Plaintiff was not disabled under the Act (Tr. at 22). On October 3, 2024, the Appeals Council denied Plaintiff's request for review of this decision, thereby making the ALJ's conclusion the Commissioner's final decision for purposes of judicial review (Tr. at 1-6).

II. LEGAL STANDARD

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." Hines v. Barnhart, 453 F.3d 559, 561 (4th Cir. 2006). However, the scope of review of such a decision is "extremely limited." Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981). "The courts are not to try the case de novo." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). Instead, "a reviewing court must uphold the factual findings of the ALJ if they are supported by substantial evidence and were reached through application of the

correct legal standard." Hancock v. Astrue, 667 F.3d 470, 472 (4th Cir. 2012) (internal quotation omitted).

"Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1993) (quoting Richardson v. Perales, 402 U.S. 389, 390 (1971)). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (internal citations and quotation marks omitted). "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." Hunter, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the court should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ]." Mastro, 270 F.3d at 176 (internal brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the ALJ." Hancock, 667 F.3d at 472. "The issue before [the reviewing court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

In undertaking this limited review, the Court notes that "[a] claimant for disability benefits bears the burden of proving a disability." Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). In this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be

3

expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.'" Id. (quoting 42 U.S.C. § 423(d)(1)(A)).[3]

"The Commissioner uses a five-step process to evaluate disability claims." Hancock, 667 F.3d at 472 (citing 20 C.F.R. §§ 404.1520(a)(4); 416.920(a)(4)). "Under this process, the Commissioner asks, in sequence, whether the claimant: (1) worked during the alleged period of disability; (2) had a severe impairment; (3) had an impairment that met or equaled the requirements of a listed impairment; (4) could return to her past relevant work; and (5) if not, could perform any other work in the national economy." Id.

A finding adverse to the claimant at any of several points in this five-step sequence forecloses a disability designation and ends the inquiry. For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied. The second step determines if the claimant is 'severely' disabled. If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at the first two steps, and if the claimant's impairment meets or equals a "listed impairment" at step three, "the claimant is disabled." Mastro, 270 F.3d at 177. Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or

---

[3] "The Social Security Act comprises two disability benefits programs. The Social Security Disability Insurance Program (SSDI), established by Title II of the Act as amended, 42 U.S.C. § 401 et seq., provides benefits to disabled persons who have contributed to the program while employed. The Supplemental Security Income Program (SSI), established by Title XVI of the Act as amended, 42 U.S.C. § 1381 et seq., provides benefits to indigent disabled persons. The statutory definitions and the regulations promulgated by the Secretary for determining disability, see 20 C.F.R. pt. 404 (SSDI); 20 C.F.R. pt. 416 (SSI), governing these two programs are, in all aspects relevant here, substantively identical." Craig, 76 F.3d at 589 n.1.

exceed a listed impairment," then "the ALJ must assess the claimant's residual functional capacity ('RFC')." Id. at 179.[4] Step four then requires the ALJ to assess whether, based on that RFC, the claimant can "perform past relevant work"; if so, the claimant does not qualify as disabled. Id. at 179-80. However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, which "requires the [Government] to prove that a significant number of jobs exist which the claimant could perform, despite [the claimant's] impairments." Hines, 453 F.3d at 563. In making this determination, the ALJ must decide "whether the claimant is able to perform other work considering both [the claimant's RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." Hall, 658 F.2d at 264-65. If, at this step, the Government cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. Hines, 453 F.3d at 567.

III.  DISCUSSION

In the present case, the ALJ found that Plaintiff had not engaged in substantial gainful activity since her alleged onset date of September 12, 2018. The ALJ therefore concluded that

---

[4] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265. "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (e.g., pain)." Hines, 453 F.3d at 562-63.

5

Plaintiff met her burden at step one of the sequential evaluation process. (Tr. at 12.) At step two, the ALJ further determined that Plaintiff suffered from the following severe impairments:

> [D]egenerative disc disease; arthritis of the knees; asthma; COPD; diabetes, and obesity[.]

(Tr. at 12.) The ALJ found at step three that none of the impairments identified at step two, individually or in combination, met or equaled a disability listing. (Tr. at 14-16.) The ALJ therefore assessed Plaintiff's RFC and determined that she could perform light work with the following, additional limitations:

> [Plaintiff] can frequently sit, stand, and walk. She can never climb ladder[s]/ropes/scaffolds. She can occasionally climb ramps/stairs, stoop, kneel, crouch and crawl. She should avoid concentrated exposure to humidity, wetness, pulmonary irritants, and hazards such as unprotected heights.

(Tr. at 16.) Based on this determination and the testimony of a vocational expert, the ALJ determined at step four of the analysis that Plaintiff remained capable of performing her past relevant work as an administrative assistant. (Tr. at 20-21.) In the alternative, the ALJ found at step five that, given Plaintiff's age, education, work experience, RFC, and the testimony of the vocational expert as to these factors, she could perform other jobs available in significant numbers in the national economy. (Tr. at 21-22.) Therefore, the ALJ concluded that Plaintiff was not disabled under the Act. (Tr. at 22.)

Plaintiff now contends that, when formulating the RFC, the ALJ "cherrypicked" the evidence, citing normal findings while ignoring or summarily discounting medical and opinion evidence supportive of greater restrictions. See Lewis v. Berryhill, 858 F.3d 858, 869 (4th Cir. 2017) ("An ALJ has the obligation to consider all relevant medical evidence and cannot simply cherrypick facts that support a finding of nondisability while ignoring evidence that points to

6

Case 1:24-cv-00993-DAB-JEP    Document 11    Filed 02/27/26    Page 6 of 17

a disability finding." (internal quotation omitted)); Arakas v. Commissioner, 983 F.3d 83, 98 (4th Cir. 2020) (finding that the ALJ's decision was "unsupported by substantial evidence" where "the ALJ erred by [] selectively citing evidence from the record"). As part of that contention, Plaintiff specifically challenges the ALJ's analysis of the opinion evidence from her treating providers Dr. Jinnah and NP Triplett. On review, the Court agrees that the ALJ's decision fails to accurately summarize or include all of the evidence, particularly the more recent evidence, and fails to provide substantial evidence for disregarding the opinions of Dr. Jinnah and NP Triplett.

As an initial matter, the Court notes that Plaintiff's DIB and SSI claims involve substantially different time periods, with only seven months of overlap. For purposes of DIB, the relevant period extends from Plaintiff's alleged onset date, September 12, 2018, to her date last insured, June 30, 2021. In contrast, the relevant time period for purposes of SSI begins on November 22, 2020, Plaintiff's application date, and extends through the date of the ALJ's decision, May 22, 2024. Because of this temporal mismatch between the two disability programs, evidence which is relevant to Plaintiff's functional ability for purposes of DIB may not impact the ALJ's SSI findings to the same extent, and vice versa. In the present case, the ALJ did not acknowledge any discrepancy, and in doing so, she failed to fully consider the effect of more recent evidence—particularly evidence of Plaintiff's worsening condition during the nearly three years after Plaintiff's date last insured—on Plaintiff's SSI claim.

The procedural course of this case serves to amplify the effect of the ALJ's error. As noted above, the ALJ first issued a decision denying Plaintiff's disability claims on March 22, 2023. (Tr. at 155-76.) However, in an Order dated September 20, 2023, the Appeals Council

7

Case 1:24-cv-00993-DAB-JEP    Document 11    Filed 02/27/26    Page 7 of 17

identified errors in the ALJ's decision, including the ALJ's failure to address the November 2022 opinion of Dr. Scott Callaghan, Plaintiff's treating neurologist, and remanded Plaintiff's case for further proceedings. (Tr. at 178-80.)[5] Accordingly, on April 25, 2024, Plaintiff appeared before the same ALJ for a brief telephone hearing on remand. (Tr. at 10, 40-49.) Although a vocational expert was present at the 2024 hearing, she was not questioned regarding Plaintiff's work or potential RFC limitations (Tr. at 47-48), and in a decision dated May 22, 2024, the ALJ again concluded that Plaintiff was not disabled under the Act (Tr. at 22). Notably, the 2024 decision now before the Court includes an RFC assessment <u>identical</u> to the RFC in the same ALJ's 2023 decision, despite the addition of significant additional evidence to the record. In fact, it appears that the ALJ simply copied the vast majority of her 2024 decision from the previous decision, with no effort to account for or assimilate new evidence except to highlight its departure from the "longitudinal record." (Tr. At 20.) Moreover, the ALJ based her findings at step five of the sequential analysis entirely on the vocational expert's testimony at the <u>prior</u>, 2023 hearing, which only remained applicable in 2024 because the same RFC was involved. Thus, it appears that, in undertaking the hearing on remand, the ALJ did not intend to change her RFC assessment or her ultimate disability finding, regardless of the Appeals Council's remand Order or subsequent evidence more supportive of Plaintiff's claims. In the context of Plaintiff's DIB claim, the ALJ's dismissal of later evidence is, perhaps, understandable, as the time period at issue expired on June 30, 2021. In the context of SSI, however, evidence of Plaintiff's limitations—and arguably her worsening

---

[5] The Appeals Council cited two issues requiring remand. In addition to the ALJ's failure to address Dr. Callaghan's opinion, the Council found that the ALJ failed to properly analyze the effects of Plaintiff's PTSD on her functional capacity. (Tr. at 178-79.)

8

condition—from 2021 forward remained highly relevant and separate from the considerations under Title II of the Act.

The impact of the ALJ's dismissal of later evidence, including the "selective citation" errors now raised by Plaintiff, can be seen in multiple ways in the ALJ's decision. For example, in the earlier decision, in finding that Plaintiff's impairments were not as disabling as alleged, the ALJ observed that Plaintiff "has not been observed to use an assistive device to aid in ambulation." (Tr. at 166.) The ALJ kept that statement in the current decision, and added only a reference to her hearing testimony, noting that, "Although she testified that she requires a cane for balance and walking, the record does not indicate an assistive device was prescribed and does not indicate she often is observed using an assistive device." (Tr. at 18.) However, these statements disregard the more recent evidence added to the record, including physical therapy records that reflect that in July 2023 she was specifically directed to begin "regular use of cane" in order "to promote increased safety with ambulation" (Tr. at 1514), and thereafter was regularly observed by multiple providers to require a cane for ambulation (Tr. at 1522, August 2023; Tr. at 1568, February 2024; Tr. at 1576, February 2024; Tr. at 1614, March 2024; Tr. at 1619, March 2024; Tr. at 1667, February 2024.)

As another example, in the earlier decision with regard to Plaintiff's COPD, in finding that Plaintiff's impairments were not as disabling as alleged, the ALJ observed that Plaintiff "has not been prescribed oxygen on a regular basis." (Tr. at 166.) That statement was repeated in the current decision. (Tr. at 18.) However, that statement fails to address the more recent records reflecting her hospitalization in February and March 2023 for "Acute respiratory failure with hypoxia" due to "COVID-19 pneumonia" and "Asthma exacerbation due to

9

COVID-19 infection" resulting in ongoing O2 use at home, especially at night (Tr. at 1470-71, 1436-37, 1568, 1575), and a subsequent hospitalization six months later in September 2023 for "Acute exacerbation of COPD with asthma," with wheezing, low oxygen saturation, and "mild pulmonary edema" on imaging, still on home O2 (Tr. at 1529, 1532, 1535, 1541, 1542), with later appointments for ongoing breathing difficulties in March 2024 (Tr. at 1648).

As another example, the ALJ in both decisions noted "normal gait; normal strength of the upper and bilateral extremities; normal range of motion of the spine and extremities; no swelling or instability of the knees . . . normal sensation; normal reflexes, and normal coordination." (Tr. at 166, 19.) In the current decision, the ALJ added cites to more recent records, although those visits relate to treatment for COVID and COPD/asthma, for anxiety, for an abdominal mass, and for sleep evaluation (Tr. at 19, citing Tr. at 1440, 1468, 1490, 1496, 1501, 1543, 1568-72, 1575-79). In contrast, the ALJ did not address the more recent records actually testing Plaintiff's gait, strength, sensation, and range of motion, reflecting limited range of motion in her knees, lower extremity strength 3/5 in hip flexion, hip extension, hip abduction, hip adduction, hip external rotation, hip internal rotation, knee extension, and knee flexion, ambulating with "increased weight shift right" and decreased sensation in the right lower extremity (Tr. at 1512, July 2023); similar strength at 3/5 with "R lateral lean, decreased stability and slow gait" and limited range of motion with "Impaired functional mobility, balance, gait and endurance" and a goal of increasing standing to 45 minutes (Tr. at 1614, 1616, 1617, March 2024). (See also Tr. at 1623, July 2023; Tr. at 1667-69, February 2024) (treatment records directed to Plaintiff's knee reflecting antalgic gait, use of a cane, on

10

examination effusion in both knees, on imaging tricompartmental arthritis of both knees, and decreased sensation and strength in the right leg.)

As an additional example, in both decisions, the ALJ found that Plaintiff's statements were inconsistent because in July 2019, she said she quit working to take care of her mother, and in February 2020, she said she was her father's primary caretaker, and in February 2021, she reported she helped with most of the household chores, and the treatment notes "do not indicate deficits in activities of daily living due to [Plaintiff's] impairments." (Tr. at 166-67, 19.) However, the ALJ did not address Plaintiff's additional testimony that in 2023 she moved in with her sister, who is a nurse, so that her sister could help care for her, including driving her to doctor's appointments (Tr. at 45), and physical therapy records confirm, for example, that Plaintiff required assistance from her sister with "donning her pants, bathing[,] and preparing her meals" (Tr. at 1612).

Finally, the impact of the ALJ's dismissal of later evidence and the "cherrypicking" errors now raised by Plaintiff is most apparent in the ALJ's treatment of the medical opinion evidence. As noted above, the Appeals Council remanded Plaintiff's case, in part, because the ALJ failed to properly evaluate the opinion evidence of record. Specifically, the ALJ's 2023 decision omitted any mention of the opinion issued by Dr. Callaghan, who described the limiting effects of Plaintiff's back impairment in the context of a note regarding her inability to serve on jury duty. (Tr. at 179, 1247.) The ALJ subsequently addressed Dr. Callaghan's opinion in the 2024 decision now before the Court, along with the newly-submitted opinions of Dr. Riyaz Jinnah and Nurse Practitioner Heather Triplett. (Tr. at 19-20.)

11

Case 1:24-cv-00993-DAB-JEP    Document 11    Filed 02/27/26    Page 11 of 17

Dr. Callaghan, Plaintiff's neurologist, opined in November 2022 that Plaintiff's lumbar radiculopathy symptoms would preclude her from sitting for long periods of time, since sitting without periodically standing and moving around could "cause [her] symptoms to worsen and have an adverse effect on her lower extremities." (Tr. at 19, 1247.) In March 2024, both Dr. Jinnah and NP Triplett opined that Plaintiff was unable to stand for more than 1 hour, walk more than 50 feet at a time, lift more than 10 pounds, or do any work that involves repetitive bending. (Tr. at 20, 1625, 1666.) Dr. Jinnah, Plaintiff's orthopedist, noted Plaintiff's bilateral knee osteoporosis as the primary basis for her opinions, while NP Triplett, who oversaw Plaintiff's neurosurgical treatment, cited Plaintiff's lumbar spine degenerative disc disease with stenosis. Specifically, NP Triplett noted that Plaintiff "suffers from low back pain which radiates to her right buttock and lateral leg to the top of her foot" and that this pain "is aggravated by any activity." (Tr. at 1666.) NP Triplett further indicated that Plaintiff has increasing weakness in her right lower extremity and that conservative treatment has been ineffective in treating her weakness or pain. (Tr. at 1666.)

The ALJ ultimately found all of these opinions unpersuasive. (Tr. at 19-20.) In doing so, the ALJ nominally considered the supportability and consistency of the opinions evidence, as required by the regulations.[6] The ALJ found that Dr. Jinnah and NP Triplett's opinions

---

[6] Under the applicable regulations for claims filed on or after March 27, 2017,

> [The ALJ] will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources. When a medical source provides one or more medical opinions or prior administrative medical findings, we will consider those medical opinions or prior administrative medical findings from that medical source together using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate. . . .

were "not supported by the limited exam findings and conservative and sparse treatment." (Tr. at 20.) Regarding consistency, the ALJ noted that Dr. Jinnah and NP Triplett's opined limitations were "not consistent with the longitudinal record which generally shows normal findings related to her gait, strength and sensation of the bilateral lower extremities and range

---

(1) Supportability. The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be.

(2) Consistency. The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be.

(3) Relationship with the claimant . . . [which includes]: (i) Length of the treatment relationship. . . (ii) Frequency of examinations. . . . (iii) Purpose of the treatment relationship. . . . (iv) Extent of the treatment relationship. . . [and] (v) Examining relationship. . . .

(4) Specialization. The medical opinion or prior administrative medical finding of a medical source who has received advanced education and training to become a specialist may be more persuasive about medical issues related to his or her area of specialty than the medical opinion or prior administrative medical finding of a medical source who is not a specialist in the relevant area of specialty.

(5) Other factors. . . . This includes, but is not limited to, evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of our disability program's policies and evidentiary requirements. . . .

20 C.F.R. § 404.1520c(a) and (c). The regulations also require decision-makers to "articulate in . . . [their] decision[s] how persuasive [they] find all of the medical opinions . . . in [a claimant's] case record." 20 C.F.R. § 404.1520c(b). Although all of the factors listed in paragraphs (c)(1) through (c)(5) of § 404.1520c should be considered in making this determination, the regulations specifically provide that the most important factors when evaluating the persuasiveness of an opinion are the first two: supportability and consistency. 20 C.F.R. § 404.1520c(a), 404.1520c(c)(1)-(c)(2). Therefore, paragraph (b) further provides that ALJs "will explain how [they] considered the supportability and consistency factors for a medical source's medical opinions . . . in [the] determination or decision." 20 C.F.R. § 404.1520c(b)(2). Express discussion of the remaining factors is not required. See 20 C.F.R. § 404.1520c(b)(3); see also Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01 (Jan. 18, 2017) (explaining that the final rules in § 404.1520c "require our [ALJs] to consider all of the factors" in § 404.1520c(c) "for all medical opinions and, at a minimum, to articulate how they considered the supportability and consistency factors" in determining persuasiveness). In other words, §§ 404.1520c(b)–(c) define the "minimum level of articulation" an ALJ must include in her written decision "to provide sufficient rationale for a reviewing . . . court." Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01; see also Drumgold v. Comm'r of Soc. Sec., 144 F.4th 596, 605 (4th Cir. 2025).

13

of motion of examination, and no consistent use of an assistive device for ambulation, despite her pain symptoms." (Tr. at 20.)

While the ALJ was entitled, and indeed required, to consider the record as a whole when assessing the opinion evidence and the Plaintiff's overall RFC, the analysis in the present case summarily rejected all evidence that failed to align with the RFC set out in the ALJ's prior decision. Evidence from the timespan between the two decisions, from March 2023 to April 2024, remained highly relevant to Plaintiff's functioning during her continuing SSI period. A review of the ALJ's decision reveals that the ALJ either dismissed later evidence as "inconsistent," ignored it, or mentioned it without further discussion.

Notably, the ALJ did not find the State agency medical consultants' opinions, issued in March 2021 and January 2022, "fully persuasive" because they were "not consistent with the combination of [Plaintiff's] impairments" and were "not supported by the evidence admitted at the hearing level" which suggested greater limitation "due to ongoing knee pain." (Tr. at 18-19, 101-05, 150-53, 167.) Although the ALJ subsequently assessed an RFC in the prior 2023 decision limiting Plaintiff to light, rather than the medium work posited by the consultants, the current decision failed to acknowledge evidence of further worsening after this time. With respect to Plaintiff's knee pain, in April 2022, Plaintiff reported increasing knee pain over the preceding several months. (Tr. at 1141.) Later that year, she began physical therapy and received injections to help with her knee pain and mobility (Tr. at 1243, 1447); nevertheless, Plaintiff presented at the emergency department in December 2022 for injuries sustained in a fall when her knee "gave out" (Tr. at 1255). In addition, the physical therapy and treatment records discussed above reflect increasing knee pain and difficulties in 2023 and

14

2024. The ALJ acknowledged some of this evidence, noting, for example, that Plaintiff "has attended physical therapy" and had some abnormal findings upon exam, including "mild to moderate difficulty with tandem walking, inability to fully squat due to knee pain, . . . bilateral knee pain with [decreased] range of motion, crepitus, and moderate medial tenderness." (Tr. at 18.) The ALJ further acknowledged that these findings were "consistent with some degree of limitation" in lifting, carrying, and postural activities. (Tr. at 18.) However, in the very next paragraph of her decision, the ALJ cited Plaintiff's "typically" normal exam findings as the basis for discounting all evidence of greater limitations.

Moreover, with respect to Plaintiff's back impairment, the Court notes that the lumbar spine MRIs in this case all postdate the State agency medical consultants' opinions. Although the ALJ listed the MRI results in her 2024 decision (see Tr. at 17-18), she never returned to address their impact, and she dismissed the only opinion evidence to consider the bearing of Plaintiff's lumbar condition on her functional abilities. This omission is significant. As recounted by the ALJ,

> In October 2022, a lumbar MRI showed: multilevel degenerative disc disease and facet arthrosis [of the] lower thoracic and lumbar spine superimposed on mild underlying congenital narrowing; most significant at the L4-S1 levels with calcified disc extrusion extending caudad to the native disc posteriorly at this level as seen in prior CT's; calcified structure posteriorly in the spinal canal of uncertain etiology but similar to prior CTs as well, this is likely an extradural structure protruding into the canal and less likely a calcified intradural mass; this causes moderate narrowing [of the] spinal canal at L4-S1 with moderate to severe narrowing [of the] right and moderate left lateral recess . . . with suspected compromise [of the] right and potentially left transiting S1 nerve roots; moderate to severe right and moderate left foraminal narrowing with suspected compromise [of the] right and potentially left exiting L4 nerve roots also at this level, and, less pronounced narrowing in other areas. . . . In August 2023, a lumbar MRI showed: advanced right L5-S1 foraminal stenosis; no advanced canal stenosis; a diffuse disc bulge and broad central disc protrusion at L5-S1 which crowds the right S1 nerve root.

15

Case 1:24-cv-00993-DAB-JEP   Document 11   Filed 02/27/26   Page 15 of 17

(Tr. at 17-18) (citing Tr. at 1183 and 1672). This imaging reflects suspected compromise of the S1 and L4 nerve roots on the right, consistent with Plaintiff's pain, numbness, and weakness in her right leg. The ALJ admitted that "[t]hese findings may account for some of [Plaintiff's] alleged spine . . . pain" (Tr. at 18), yet the ALJ concluded that the objective evidence does not support the degree of pain and limitation alleged by Plaintiff (Tr. at 17, 18). Notably, Plaintiff testified that in the time between her two hearings, she began using a cane for balance to prevent falls, attended physical therapy, was scheduled to begin spinal injections, and was not able to drive because she experienced numbness from her right hip down to her toes. (Tr. at 17.) In discounting Plaintiff's assertions of increasing spinal symptoms, the ALJ noted that Plaintiff had not undergone spinal surgery or been seen in the emergency department for acute spinal pain. (Tr. at 18.) The ALJ further noted that "the exam notes largely do not show that [Plaintiff] had an antalgic gait or that she presented with an assistive device." (Tr. at 19.) However, as discussed above, the ALJ relied almost entirely on cherrypicked evidence of Plaintiff's functioning predating the March 2023 decision when assessing her abilities.[7] Moreover, the ALJ, having discounted Dr. Callaghan, Dr. Jinnah, and NP Triplett's opined limitations as "not consistent with the longitudinal record," failed to seek a further medical evaluation or opinion, and was left with nothing but her lay opinion to support her assessment

---

[7] As to Dr. Callaghan, the ALJ determined that his "opinion is not supported by the findings of the EMG nerve conduction study, which Dr. Callaghan noted showed no evidence of radiculopathy," and that "Dr. Callaghan's sitting limitation is . . . not supported by his limited examination findings which were unremarkable except for mild to moderate difficulty with tandem walking." (Tr. at 20) (citing Tr. at 1169). However, a closer reading of Dr. Callaghan's treatment notes reveals that he did not base his diagnosis of lumbar radiculopathy on Plaintiff's EMG nerve conduction study, but instead on her "quite severe" lumbar MRI findings, as well as significantly diminished sensory and reflex findings on examination. (See Tr. at 1169.) In fact, these findings were severe enough to warrant a referral to spinal surgery. (Tr. at 1169.) Thus, even as to Dr. Callaghan, the ALJ's analysis failed to accurately reflect the evidence supporting the opinion.

16

of Plaintiff's worsening spine and knee conditions on her RFC.[8]  In short, the Court finds that substantial evidence fails to support the ALJ's 2024 decision.

IT IS THEREFORE RECOMMENDED that the Commissioner's decision finding no disability be REVERSED, that Defendant's Dispositive Brief [Doc. #9] be DENIED, that Plaintiff's Dispositive Brief [Doc. #8] be GRANTED, and that this action be REMANDED for further consideration.

This, the 26th day of February, 2026.

/s/ Joi Elizabeth Peake
Joi Elizabeth Peake
United States Magistrate Judge

---

[8] The Court also notes that, similarly, the ALJ relied on her own lay opinion regarding Plaintiff's psychological impairments, rejecting the opinions of state agency psychological consultant Dr. Farish-Ferrer (98-99, 105-09), the psychological consultative examiner Dr. Ritz (981-83), and Plaintiff's treating provider PA Weaver (Tr. at 1506), all of whom opined, consistently, that Plaintiff's mental impairments would result in limitations in her ability to work. (Tr. at 13-14).  Having rejected the opinion of every medical professional, it is not clear what evidence remained for the ALJ to base her decision on.  Moreover, the ALJ did not consider or address the treatment records for Plaintiff's treating psychiatrist, Dr. Masodkar (other than to cite the therapy records to support a finding of no gait abnormalities) (Tr. at 19-20, 1499-1503), or other treatment records for anxiety disorder (e.g., Tr. at 1657), similarly reflecting a failure to fully consider the more recent evidence.

17

Case 1:24-cv-00993-DAB-JEP     Document 11     Filed 02/27/26     Page 17 of 17